UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

J. CALDARERA & COMPANY, INC.                                    PLAINTIFF

V.                                    CIVIL ACTION NO. 3:17-CV-917-DPJ-FKB

COMPLEX MANAGEMENT, INC.                                    DEFENDANTS
AND CROSBY SHELTERS, LTD.

ORDER

Plaintiff J. Caldarera & Company, Inc. ("JCC") filed this lawsuit to compel Defendants

Complex Management, Inc. ("CMI") and Crosby Shelters, Ltd. ("CSL") to arbitrate JCC's

breach-of-contract and related claims.  Defendants resist arbitration and have asked the Court to

preliminarily enjoin the arbitration JCC has already initiated.  For the reasons that follow, JCC's

Motions to Stay and Compel Arbitration [3, 4, 11] are granted, and Defendants' Motion to

Preliminarily Enjoin Arbitration [18] is denied.

I.      Background

Defendant CSL owns, and Defendant CMI manages, the Crosby Shelters Apartments in

Crosby, Mississippi.  In August 2016, the apartments sustained flood and wind damage, so in

January 2017, Andrew Ivison, the then-president of both CSL and CMI, signed two contracts

with JCC to repair the property.  He did so on behalf of CMI.  Both contracts contained

arbitration provisions, which JCC now invokes to recover an alleged debt of over $1.5 million

from CMI and CSL.

II.     Analysis

JCC has invoked section 4 of the Federal Arbitration Act, which permits "[a] party

aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written

agreement for arbitration [to] petition any United States district court . . . for an order directing

that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

"Arbitration is a matter of contract between the parties, and a court cannot compel a party to arbitrate unless the court determines the parties agreed to arbitrate the dispute in question." *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1064 (5th Cir. 1998).

"Enforcement of an arbitration agreement involves two analytical steps. The first is contract formation—whether the parties entered into *any arbitration agreement at all*. The second involves contract interpretation to determine whether this claim is covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (citations omitted).

Here, the parties focus on two issues. First, they dispute the first prong of the arbitration test—whether a valid agreement to arbitrate existed. Second, Defendants alternatively say JCC waived any right to arbitrate.

A.     Whether the Parties Agreed to Arbitrate

Whether the parties entered a valid agreement to arbitrate is decided under state contract law. *May v. Higbee Co.*, 372 F.3d 757, 764 (5th Cir. 2004) (citing *Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004)). And that question is not subject to the federal policy favoring arbitration. *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 215 (5th Cir. 2012) (citations omitted). Because this analysis differs for the claims against CMI and CSL, the Court will consider them separately.

1.     CMI

It is beyond dispute that the two contracts for repairs to the Crosby Shelters Apartments were "BETWEEN" CMI and JCC. *See* First Contract [1-1]; Second Contract [1-2]. Both

contracts contained arbitration agreements, and there is no *legitimate* argument that Andrew Ivison—CMI's president—lacked the capacity to bind CMI.

CMI nevertheless says the contracts lacked mutual assent. Defs.' Mem. [14] at 6. Mutual assent is a necessary element of contract formation. *See Rotenberry v. Hooker*, 864 So. 2d 266, 270 (Miss. 2003). And ordinarily, the parties' signatures are sufficient to prove it. *Byrd v. Simmons*, 5 So. 3d 384, 389 (Miss. 2009) ("The object of a signature is to show mutuality of assent." (Citation and quotation marks omitted)). Here, both parties signed the two CMI/JCC contracts.

Despite these signatures, Defendants offer two reasons why mutual assent was lacking: (1) both contracts misidentified CMI as the complex's "Owner" rather than the agent or manager, and (2) there is testimony suggesting that Andrew Ivison informed JCC that CSL would ultimately be responsible for payment. From this, Defendants say "JCC and CMI never intended to bind CMI to the Contracts." Defs.' Mem. [14] at 4.

To begin, the question is whether mutual assent existed to bind CMI *to an agreement to arbitrate*. *Kubala*, 830 F.3d at 201. Both contracts identified CMI as the contracting party, were fully executed, and contained valid arbitration provisions. *See* First Contract [1-1]; Second Contract [1-2]. Even assuming the contracts mislabeled CMI's role, Defendants have not legally supported their argument that this mistake somehow voided CMI's pledge to arbitrate all "[c]laims, disputes, or other matters in controversy arising out of or related to the Contract." AIA Doc. A201-2007 [11-3] at 39.

As for testimony that the parties thought CSL would pay for the work, that evidence violates the parol evidence rule. "[P]arol evidence will not be received to vary or alter the terms of a written agreement" that "is not ambiguous." *Turner v. Terry*, 799 So. 2d 25, 32 (Miss.

2001).  "To permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made . . . would absolutely destroy the value of all contracts." *Busching v. Griffin*, 542 So. 2d 860, 865 (Miss. 1989) (quoting *Alliance Trust Co., Ltd. v. Armstrong*, 186 So. 633, 635 (Miss. 1939) (internal quotation marks omitted)).  The contract speaks for itself and binds CMI to arbitrate its disputes with JCC.[1]

2.      CSL

There is no contract containing an arbitration agreement between JCC and CSL.  But JCC argues that CSL is bound by the CMI/JCC contracts because "CMI . . . enter[ed] into the Contracts on CSL's behalf."  Pl.'s Reply [17] at 5.

"A nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency."  *Bailey*, 364 F.3d at 267, *cited in B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 492 (Miss. 2005); *see The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 538 (5th Cir. 2008) ("Directly put, where an agent signs a contract requiring arbitration, the principal is bound by the arbitration requirement.").  "Under [Mississippi] agency law, a principal is bound by the actions of its agent within the scope of that agent's real or apparent authority."  *Booker ex rel. Certain Underwriters at Lloyd's of London v. Pettey*, 770 So. 2d 39, 45 (Miss. 2000).

JCC argues that pursuant to a Management Agreement, CSL designated CMI as its agent with actual authority to "[p]urchase all materials, equipment, tools, appliances, supplies, and services necessary for proper maintenance and repair of the" Crosby Shelters Apartments.  Management Agreement [17-1] ¶ IV(C).  CSL agrees, but notes that the agreement capped

---

[1] Even assuming the testimony could be considered, it relates to payment issues rather than mutual assent to the arbitration provision.  *See Kubala*, 830 F.3d at 201 (observing that first step in arbitration analysis is to determine whether there exists a valid agreement to arbitrate).

CMI's authority by requiring CSL's "prior written approval . . . for any expenditure which exceeds . . . $1,000.00 in any one instance for . . . labor, materials, or otherwise in connection with the maintenance and repair of the project." *Id.* ¶ IV(D).

Both of the CMI/JCC contracts involved expenditures vastly exceeding $1,000.00, and there is no evidence that CMI obtained CSL's prior written approval. Absent such evidence, CSL is not bound because CMI acted beyond the scope of its actual authority when it signed the JCC contracts. *See Northlake Dev. L.L.C. v. BankPlus*, 60 So. 3d 792, 976 (Miss. 2011) ("If an agent purports to act for his principal but is without any legal authority to do so, his action generally has no legal effect on his principal." (footnotes omitted)).[2]

JCC next says CSL ratified the contracts containing the arbitration provisions when it made payments on those contracts. To support that claim, JCC has submitted checks *drawn on CSL's construction account* dated March 12, 2017, April 26, 2017, and August 11, 2017, made out to JCC, totaling $795,781.24. Checks [11-6].

Mississippi law "allows a principal to ratify the agent's unauthorized acts, and, upon doing so, [the principal] becomes bound." *BankPlus*, 60 So. 3d at 797. Ratification occurs when the principal "manifest[s] assent that the act shall affect that person's legal relations" or engages in "conduct that justifies a reasonable assumption that the [principal] so consents." *Id.* (emphasis, footnote, and internal quotation marks omitted). Making payments on a contract demonstrates ratification. *See St. Paul Guardian Ins. Co. v. Cordova Constructors MS, LLC*, No. 1:12-CV-56-GHD, 2015 WL 2160518, at *6 (N.D. Miss. May 7, 2015); *accord GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1308–09 (11th Cir. 2017).

---

[2] JCC does not suggest that CMI had apparent authority to bind CSL to the contracts.

CSL acknowledges these payments but says they represented insurance proceeds and argues—without legal authority—that "a payment of insurance proceeds to JCC [does not] make[] CSL a party to the Contracts." Defs.' Mem. [14] at 6. The Court does not see how the source of the funds changes the fact that CSL received the benefit of the bargain and remitted almost $800,000 from its own account to pay the obligations its agent (CMI) accepted. CSL ratified the contracts and is therefore bound by the arbitration provisions in them.

C.      Waiver

The next question is whether JCC waived its right to insist upon arbitration. "A party who has entered into an agreement to arbitrate must insist on this right, lest it be waived. . . . [A] party waives its right to arbitrate if it (1) substantially invokes the judicial process and (2) thereby causes detriment or prejudice to the other party." *Janvey v. Alguire*, 847 F.3d 231, 243 (5th Cir. 2017) (internal quotation marks and citation omitted). "[W]aiver should not be inferred lightly." *Id.*; *accord Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991) ("A party asserting waiver . . . bears a heavy burden of proof in its quest to show that an opponent has waived a contractual right to arbitrate."). Thus, "any doubts [whether waiver occurred] should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 US 1, 24 (1983).

Defendants say JCC waived its right to arbitrate in 2017 by participating in state-court probate proceedings between Andrew Ivison, his brothers, and his stepmother, Rebecca Ivison. In those proceedings, the chancellor entertained competing offers from Rebecca Ivison on the one hand and three Ivison sons on the other to purchase the assets of Herb Ivison's estate— including the estate's interest in CMI and CSL. On June 20, 2017, the chancellor accepted Rebecca Ivison's offer and entered an Order Directing Sale of Assets, noting its "specific intent .

. . to insure a qui[et], peaceful, efficient and effective transfer of all assets of the Estate of

Herbert Bernard Ivison, Jr., to Rebecca Case Ivison." Order [13-3] ¶ 11.

JCC entered the picture when, on September 27, 2017, Rebecca Ivison moved to clarify

that order to state that she would purchase the assets "free and clear of any alleged unprobated

claims or debts." Mot. to Clarify [17-4] ¶ 2. She specifically included as "unprobated claims

and debts . . . the claims asserted by [JCC] for construction work on Crosby Shelters

Apartments." *Id.* ¶ 6. In other words, she sought an order that might extinguish JCC's claim to

more than $1.5 million.

In response to Rebecca Ivison's motion, JCC sought to intervene in the probate

proceedings and filed its own Motion to Clarify Order Directing Sale of Assets [13-4]. JCC

noticed that motion for an October 6, 2017 hearing, at which its attorney explained that JCC had

not filed litigation over the Crosby Shelters Apartments work and "[i]f [JCC] did it would be

arbitration." Oct. 6, 2017 Tr. [13-5] at 71. JCC's attorney later reiterated that he was "not

waiving the arbitration clause," asserting that it "would still be valid and not waived by us

appearing today in this matter." *Id.* at 82. Counsel for JCC later appeared at two additional

hearings in the probate proceedings after it filed its complaint in this matter.

On these facts, Defendants have not met their "heavy burden" to show that JCC waived

its right to compel arbitration. *Walker*, 938 F.2d at 577. First, JCC did not "substantially

invoke[]" the judicial process. *Janvey*, 847 F.3d at 243. It made a limited appearance in an

effort to protect its claim from Rebecca Ivison's apparent attempt to gain control over CMI and

CSL free and clear of the JCC debt. And when it did so, JCC expressly preserved the right to

arbitrate. Accordingly, this is not a case "where a party fails to demand arbitration, and, in the

meantime engages in pretrial activity inconsistent with an intent to arbitrate." *Republic Ins. Co.*

*v. PAICO Receivables, LLC*, 383 F.3d 341, 347 (5th Cir. 2004) (citation and quotation marks omitted).

Second, Defendants fail to demonstrate that JCC's limited involvement in the probate proceedings prejudiced them. "Prejudice, in this context, refers to delay, expense, and damage to a party's legal position." *Janvey*, 847 F.3d at 244 (citation and quotation marks omitted). Here, Defendants say "JCC's litigation *of this dispute* in the [probate proceedings], and its delay in making a demand for arbitration" caused prejudice resulting in "additional legal fees." Defs.' Mem. [14] at 9 (emphasis added). But JCC never truly litigated "this dispute" in state court. And Defendants have not shown that JCC substantially increased their expenses. At the October 6, 2017 hearing, JCC's motion was one of "a plethora of motions" estimated by the chancellor to be "somewhere between 12 and 15 or 20" on the docket. Oct. 6, 2017 Tr. [13-5] at 3. As for delay, JCC offers record evidence demonstrating its efforts to resolve the dispute before litigation or arbitration. Pl.'s Reply [17] at 7; Letters [17-3]; *see Walker*, 938 F.2d at 578 (holding that "attempts at settlement . . . do not preclude the exercise of a right to arbitrate"). Finally, Defendants have not shown that JCC's participation in the probate proceedings damaged their legal positions in this case. *Janvey*, 847 F.3d at 244. JCC did not waive its right to seek arbitration.

D.      Defendants' Motion to Enjoin

Defendants have asked the Court to preliminarily enjoin the arbitration JCC initiated. Because the Court has concluded that CMI and CSL are bound to arbitrate JCC's claims, they fail to show a substantial likelihood of success on the merits. Defendants' motion is denied.

III.   Conclusion

The Court has considered all arguments.  Those not specifically addressed would not have changed the outcome.  For the foregoing reasons, Plaintiff's Motions to Stay and Compel Arbitration [3, 4, 11] are granted to the extent they seek to compel arbitration, and Defendants' Motion to Preliminarily Enjoin Arbitration [18] is denied.

Finally, JCC seeks a stay, "at least as between JCC, CMI, and CSL, while arbitration is pending."  Pl.'s Mem. [12] at 1.  This request is a little tricky because there are other claims involving other parties.  Accordingly, the parties are directed to confer and see whether a mutually agreeable and practical solution is available.  If not, they are instructed to set the issue for a status conference before the magistrate judge.

**SO ORDERED AND ADJUDGED** this the 13th day of April, 2018.

s/ *Daniel P. Jordan III*_____
CHIEF UNITED STATES DISTRICT JUDGE